UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CHARLES THOMAS,

Plaintiff,

v.

SGT. FRANKLIN, SGT. CALDWELL,
SGT. E. FLAKES, and SGT. FLAKES (Sgt.
E. Flakes' twin sister),

Defendants.

CAUSE NO. 3:25-CV-547-HAB-ALT

OPINION AND ORDER

Charles Thomas, a prisoner without a lawyer, filed an amended complaint and a motion for preliminary injunction. ECF 8 & ECF 9.[1] "Under 28 U.S.C. § 1915A, the court must screen the complaint and dismiss it if the action is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. To proceed beyond the pleading stage, a complaint must contain sufficient factual matter to "state a claim that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556

---

[1] Because the amended complaint supersedes the original complaint (ECF 2), the original motion for preliminary injunction (ECF 4) will be denied as moot.

U.S. 662, 678 (2009). When a plaintiff is proceeding without counsel, the court must give his allegations liberal construction. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Over five years ago, Thomas filed a lawsuit and was granted leave to proceed against Sgt. Flakes and Lt. Jones for denying him food over a two-day period at the Westville Correctional Facility (WCF). *See Thomas v. Flakes*, cause no. 3:20-CV-506-DRL-MGG (N.D. Ind. filed Jun. 17, 2020).[2] Summary judgment was granted in the defendants' favor, and the case was dismissed on December 7, 2022, because Thomas had failed to exhaust his administrative remedies. *Id*. at ECF 41.[3] Additionally, Thomas claims he was "assault[ed]" by Sgt. Caldwell while at WCF in 2020, which was "confirmed" by Investigation and Intelligence (I&I). ECF 8 at 3. While his complaint doesn't provide any details about the "assault," documents attached to it show that Sgt. Caldwell hit him in the back of the head with a clipboard in the dining hall and told him to leave.[4]

Thomas was released from WCF in early 2021, but he believes these relatively minor incidents spawned a murder-for-hire plot against him involving not only the

---

[2] The amended complaint in that case named "Sgt. Flakes . . . 'Sgt. working E/C (on I-Bracket) during dates of incidents stated on #4.'" ECF 10 at 2. The amended complaint also sued the Indiana Department of Correction, Warden Sevier, John Galipeau, David Leonard, and Phillip Sonnenberg, but those defendants were dismissed upon screening and are not part of the current lawsuit. *See Thomas v. Flakes*, cause no. 3:20-CV-506-DRL-MGG (N.D. Ind. filed Jun. 17, 2020), at ECF 10 & ECF 18.

[3] Prior to the dismissal, Thomas was released from prison in January of 2021. *Id*. at ECF 11.

[4] A grievance about an incident on July 31, 2020, alleges Sgt. Caldwell hit him in the back of the head with a clip board and told him to get out of the "chow hall." ECF 8-1 at 1. Thomas stated he would "like for her to receive some type of discipline because if I had touched her with anything in the manner she touched me, I would've been disciplined immediately." *Id*. Thomas does not indicate he was injured in any way during the incident. A response to that grievance indicates the "allegations had been confirmed and that the case was referred to the Warden's office for appropriate action." *Id*. at 2.

individuals who played a part in the incidents from five years ago, but also almost every prison official he has dealt with since his re-arrival at WCF on March 4, 2025. Thomas's allegations span twenty-two pages, include an additional thirty-four pages of exhibits, and name nineteen defendants ranging from individual officers to the Indiana Department of Correction (IDOC) Ombudsman Bureau Director. The gravamen of Thomas's complaint is that the defendants have been deliberately indifferent to his safety concerns, are failing to protect him from harm, and have retaliated against him. He seeks compensatory and punitive damages in the amount of $1,200,000.00 as well as a permanent and preliminary injunction to be transferred to another facility.

*Eighth Amendment Failure to Protect*

The Eighth Amendment imposes a duty on prison officials "to take reasonable measures to guarantee the safety of inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Id*. at 833. That said, not every such violent altercation violates the Constitution. *Hunter v. Mueske*, 73 F.4th 561, 565 (7th Cir. 2023). "Rather, only deliberate indifference to an inmate's wellbeing is actionable: a prison official is liable for failing to protect an inmate from another prisoner only if the official knows of and disregards an excessive risk to inmate health or safety." *Id*. (internal quotation marks, brackets, and citations omitted). Accordingly, when an inmate is attacked by another inmate, the Eighth Amendment is violated only if "deliberate indifference by prison officials effectively condones the attack by allowing it to happen." *Haley v. Gross*, 86 F.3d 630,

640 (7th Cir. 1996). The defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "[A] complaint that identifies a specific, credible, and imminent risk of serious harm and identifies the prospective assailant typically will support an inference that the official to whom the complaint was communicated had actual knowledge of the risk." *Gevas v. McLaughlin*, 798 F.3d 475, 481 (7th Cir. 2015). General requests for help, expressions of fear, and even prior attacks are insufficient to alert guards to the need for action. *Klebanowski v. Sheahan*, 540 F.3d 633, 639–40 (7th Cir. 2008). "[P]risons are dangerous places," as "[i]nmates get there by violent acts, and many prisoners have a propensity to commit more." *Grieveson v. Anderson*, 538 F.3d 763, 777 (7th Cir. 2008).

In the context of failure to protect cases, the Seventh Circuit has equated "substantial risk" to risks so great that they are almost certain to materialize if nothing is done." *Brown v. Budz*, 398 F.3d 904, 911 (7th Cir. 2005); *see also Thomas v. Dart*, 39 F.4th 835, 843 (7th Cir. 2022) (quoting *Brown* and noting that a "bare 'increased risk' [associated with mental health issues] does not necessarily correlate to a 'substantial risk'"). "[A] prisoner normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996). "Exercising poor judgment . . . falls short of meeting the standard of consciously disregarding a known risk to his safety." *Lewis v. Richards*, 107 F.3d 549, 554 (7th Cir. 1997).

Here, as noted above, Thomas essentially claims that everyone associated with his previous lawsuit and the clipboard incident from five years ago—plus everyone he has encountered at WCF since his re-arrival in March of 2025—is either out to kill him or intends to look the other way while he is harmed. Despite the complaint's length and level of specificity, very few factual allegations support his claims. According to Thomas, his troubles began even before he arrived at WCF. Although he had informed Classification Specialist S. May about the previous lawsuit and clipboard incident, telling her he was "in fear of his life and safety" because of it, she transferred him to WCF anyway and didn't grant his request for a "seperatee" between Thomas and the defendants. ECF 8 at 3. Thomas believes she violated his constitutional rights simply by sending him back to WCF, but he is mistaken. If every inmate who filed a lawsuit against or had negative encounters with prison officers was prevented from ever returning to that same facility—even years later—it would be difficult to find placement for inmates. More importantly, Thomas didn't identify a specific and credible risk of harm to Classification Specialist May—his speculative fears about possible harm related to the previous lawsuit and complaint weren't sufficient—so this claim will be dismissed. *See e.g., Gevas*, 798 F.3d at 481; *see also Klebanowski*, 540 F.3d at 639–40 (neither general expressions of fear nor prior attacks are sufficient).[5]

---

[5] The same analysis applies to Thomas's allegation that he sent a request slip to Warden Smiley and Deputy Warden Gann the day after his arrival to "explain the lawsuit and safety concerns" to them. ECF 8 at 14.

During his first few months back at WCF, Thomas describes several encounters with staff members that made him feel uncomfortable and two instances where he was harmed by other inmates. In a nutshell, some officers made rude comments about him returning to WCF, remembering him from his prior stay as being a "snitch," transferring him to worse areas of the prison, and refusing to take his concerns seriously.[6] As for physical altercations, there were only two. His belongings were stolen, and he was "beat up on, while being called 'a snitch for telling on wrong guard'" about a week after his March 4, 2025, arrival. ECF 8 at 5. Then, on April 16, 2025, after he had been transferred to the GSC side, he was "robbed and assaulted for snitching on the wrong Sgt. per assailant." *Id*. His complaint doesn't provide any additional details about the attacks, the attackers, or whether he suffered injuries. Importantly, although he allegedly told Case Manager/Counselor Kecia Green about his concerns after the first incident and Officer Cron about them after the second incident,[7] he doesn't plausibly allege he pre-identified a prospective assailant or provided any of the defendants with specific information prior to the attacks other than his general worry and speculation that the prison guards were out to get him due to the lawsuit and incident from five years ago. These allegations aren't sufficient to state a plausible claim that any of the named defendants failed to protect him from the two attacks he

_____

[6] The specific comments will be discussed below in the context of First Amendment retaliation claims.

[7] Thomas claims he had his "initial meeting" with Case Manager/Counselor Kecia Green on March 27, 2025. ECF 8 at 13. He states he first told Officer Cron about his concerns after the April 16, 2025, incident and was informed an "investigation would take place." *Id*. at 5.

6

experienced by other inmates. *See e.g., Gevas*, 798 F.3d at 481 (complaint must identify "a specific, credible, and imminent risk of serious harm and identif[y] the prospective assailant"); *Klebanowski*, 540 F.3d at 639–40 (general requests for help, expressions of fear, and even prior attacks are insufficient).

After those physical incidents, Thomas also describes several instances where he was allegedly threatened by inmates. On April 26, 2025, he was "threatened to be killed and called a snitch for ratting out staff," but he doesn't describe the inmate(s) who made these threats. ECF 8 at 5. He claims he "spoke with a Sgt." the next day, but he doesn't identify the officer. On May 20, 2025, Thomas heard three unknown offenders inquiring about him, so he turned around and went back to his dorm. He doesn't expand upon what he heard, and, in any event, nothing physical came of that incident. On June 12, 2025, Thomas was approached by two familiar-looking but unknown inmates who asked him if he was a snitch and requested his criminal history file. One of the men had a "make-shift metal object (knife) in his hand, on side of his leg." *Id.* at 10. However, once those individuals determined he wasn't a snitch, they handed him a note that said:

> [Sgt.] Franklin said that there is a nigga over there named Charles Thomas with braids and he telling some shit. He put $500.00 on him with S.O.S. *but want it done this weekend* when his shift on for confirmation. I got $250.00 if one of them young nigggas over there wanna do it. Let me know at next C-card Meds Lord.

ECF 8-1 at 24 (emphasis added). Thomas then told the individuals about his previous lawsuit against the guards and the issue with Sgt. Caldwell. After hearing Thomas's explanation, the man said, "[T]hat aint snitching, they on some bullsh**, we not taking

this one." ECF 8 at 10. The individuals threw the note in the toilet and left, but Thomas retrieved the note and hid it in his sock. Later that same day, Thomas spoke with several officers about that incident and his previous concerns. Instead of helping him, they became angry. However, Thomas was immediately placed in a small holding cell for twelve hours before being transferred to the E/C side.

Thomas's own allegations cut against any failure to protect claims associated with these alleged threats. He admits he wasn't physically harmed or even touched by the inmates during these encounters and that the would-be attackers decided *not* to pursue him in the future. *See, e.g., Kemp v. Fulton Cty.*, 27 F.4th 491, 494 (7th Cir. 2022) ("Incarcerated people have a clearly established right to be free from *physical harm* inflicted by others in the institution.") (emphasis added)); *see also Walker v. Leibert*, 844 F. App'x 920, 922 (7th Cir. 2021) ("[T]o the extent Walker seeks damages based on the risk of what could have happened to him as a result, that risk is not actionable under § 1983 without actual injury."). More importantly, he admits he was subsequently moved to a different area of the facility in order to remove him from the vicinity of Sgt. Franklin and the men who had approached him.[8] And, although he insists the note is evidence of a conspiratorial murder-for-hire plot against him related to the previous lawsuit (involving Sgt. Flakes and Lt. Jones) and the clipboard incident (involving Sgt. Caldwell), he doesn't explain how or why Sgt. Franklin—who wasn't involved in either

---

[8] That same day, he was placed in a "detox cell" and then moved to the E/C side. ECF 8 at 11; *see also id*. at 5 ("Plaintiff was moved from G.S.C. side (because of incident with Sgt. Franklin) back to E/C side.").

of those previous matters—could reasonably have been considered to be part of that conspiracy by any of the *other* defendants responsible for protecting him.[9] Nor does he provide any details to plausibly suggest Sgt. Franklin subsequently enlisted other inmates to complete the proposed hit after it had been abandoned. Based on these facts, it's not plausible to infer the defendants have failed or are failing to protect Thomas from harm. *See e.g., Gevas*, 798 F.3d at 481 (complaint must identify "a specific, credible, and imminent risk of serious harm and identif[y] the prospective assailant"); *see also Beaman v. Freesmeyer*, 776 F.3d 500, 510–11 (7th Cir. 2015) (describing elements of conspiracy and noting that evidence of it "cannot be speculative").[10]

As an additional note, Thomas alleges he sent many requests and grievances to defendants with supervisory positions such as Warden Smiley, Deputy Warden Gann, and the Department of Administration DOC Ombudsman Bureau Director Charlene A. Burkett. *See generally* ECF 8 at 14–17. However, "'[n]o prisoner is entitled to insist that one employee do another's job,' and the division of labor is critical to the efficient

---

[9] He doesn't allege he was injured or attacked *after* the note was discovered, so Thomas hasn't stated any failure to protect claims associated with it. That said, the alleged threat will be discussed in the context of retaliation below.

[10] The court has also reviewed Thomas's allegations in conjunction with the grievances and requests for interviews attached to the complaint. None of Thomas's requests for help contain the sort of specificity necessary to establish a failure to protect claim associated with the two physical attacks or an ongoing threat. For example, he claims Sgt. Flakes "kept staring at [him]" shortly after his arrival, addressed him with an "attitude tone and evil smirk," said she remembered him from the previous lawsuit, and told him to "[b]e safe and have a good day." ECF 8-1 at 6. He submitted a grievance on April 27, 2025, claiming he spoke with Sgt. Franklin about his concerns, but Sgt. Franklin responded with, "I know who you are Thomas with yo snitch ass. Welcome back to Westville. Get yo ass back in [the chow] line." *Id.* at 11. His assertions that he "shouldn't be around these people, my life is in jeopardy" (*id.* at 6) and that "I need to be protected, I don't feel safe here" (*id.* at 11) are based on a speculative interpretation of relatively benign encounters. Although many of the other requests mention the prior lawsuit and incident as well, they don't adequately tie that information to any sort of credible and ongoing threat.

functioning of the organization." *Aguilar v. Gaston-Camara*, 861 F.3d 626, 633 (7th Cir.

2017) (quoting *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009)). There is no general

respondeat superior liability under 42 U.S.C. § 1983. *Burks*, 555 F.3d at 594. "[P]ublic

employees are responsible for their own misdeeds but not for anyone else's." *Id*. at 596.

This is a high standard, designed to ensure that "supervisors are responsible for their

own acts but not for those of subordinates, or for failing to ensure that subordinates

carry out their tasks correctly." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018).

Thomas's amended complaint does not provide a factual basis for suing these high-

level supervisory defendants, especially considering Thomas admits he was moved to

various locations within the prison in response to his complaints by those who were

directly responsible for such housing decisions.

Similarly, he claims the grievance specialists Ms. S. Smith and Ms. Wozniak

"ignored Plaintiff's right to be heard, to file complaints about the threats, abuse,

misconduct, corruption and neglect from staff." ECF 8 at 17–18. But they cannot be sued

for simply managing the grievance process, *see Burks*, 555 F.3d at 595, and there is no

constitutional right to a grievance process in general. *See Grieveson v. Anderson*, 538 F.3d

763, 770 (7th Cir. 2008) (noting that there is not a Fourteenth Amendment substantive

due process right to an inmate grievance procedure).

Finally, he claims the I&I department ignored his safety concerns "that Plaintiff

would be in imminent danger from the previous lawsuit and threats made from other

staff and offenders motivated by staff influence or gain." ECF 8 at 21. Thomas states

they are "being sued for $100,000 as a collective group." *Id*. However, he cannot

proceed against the I&I department as a whole because "it is pointless to include lists of anonymous defendants in federal court; this type of placeholder does not open the door to relation back under Fed. R. Civ. P. 15, nor can it otherwise help the plaintiff." *Wudtke v. Davel*, 128 F.3d 1057, 1060 (7th Cir. 1997) (internal citations omitted); *see also Burks*, 555 F.3d at 596; *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) ("Only persons who cause or participate in the violations are responsible."). Thus, Thomas has failed to state plausible failure to protect claims against any of the defendants.

*Fourteenth Amendment Due Process*

Thomas also complains about being sent to the "GSC side" of the building because it is "known for excessive and overlooked gang activity, assaults, robberies, theft, stabbings, and other violent activities that isn't as common/rampant in any other are of the facility." ECF 8 at 4–5. According to Thomas, he was sent to the GSC side about three weeks after he arrived at WCF where he was "robbed and assaulted" on April 16, 2025, as discussed above. *Id.* at 5. However, by May 20, 2025, he was moved "back to E/C side" (*id.*), later in June to the "I/C side" (*id.* at 7), and in response to his concerns about Sgt. Flakes in mid-July was "moved again, back on E/C side with Sgt. E. Flakes where he presently is, scared to death" (*id.*). Although it's unclear, Thomas may be attempting to bring Fourteenth Amendment due process claims based on these housing moves.[11]

---

[11] To the extent these assertions are part of his retaliation claims, they will be discussed separately below.

The Fourteenth Amendment provides state officials shall not "deprive any person of life, liberty, or property, without due process of law . . .." U.S. Const. amend. XIV, § 1. That said, due process is only required when punishment extends the duration of confinement or imposes "an atypical and significant hardship on him in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). The Seventh Circuit has "concluded that inmates have no liberty interest in avoiding transfer to discretionary segregation—that is, segregation imposed for administrative, protective, or investigative purposes." *Townsend v. Fuchs*, 522 F.3d 765, 771 (7th Cir. 2008) (citing *Lekas v. Briley*, 405 F.3d 602, 608–09 & 608 n.4 (7th Cir. 2005) ("[R]eassignment from the general population to discretionary segregation does not constitute a deprivation of a liberty interest.")); *see also DeTomaso v. McGinnis*, 970 F.2d 211, 212 (7th Cir. 1992) ("[P]risoners possess neither liberty nor property in their classifications and prison assignments."); *Healy v. Wisconsin*, 65 Fed. Appx. 567, 568 (7th Cir. 2003) ("[I]nmates do not have a protected liberty interest in a particular security classification.") (citing *Sandin*, 515 U.S. at 486).

Although later cases have questioned the conclusion that placement in nonpunitive segregation can "*never* implicate a liberty interest," *see Williams v. Brown*, 849 Fed. Appx. 154, 157, n.3 (7th Cir. 2021) (emphasis added), timing plays a part in the analysis, even when conditions are significantly harsher. *See e.g., Isby v. Brown*, 856 F.3d 508, 524 (7th Cir. 2017) ("Prisoners do not have a constitutional right to remain in the general population, but both the duration *and* the conditions of the segregation must be considered in determining whether due process is implicated.") (internal quotation

marks, parenthesis, and citations omitted; emphasis in original); *Marion v. Columbia Correction Inst.*, 559 F.3d 693, 697-98 & nn.2–3 (7th Cir. 2009) (collecting cases that held segregation of two to ninety days does not trigger due process concerns and stating, "In a number of other cases, we have explained that a liberty interest may arise if the length of segregated confinement is substantial *and* the record reveals that the conditions of confinement are unusually harsh.") (emphasis added); *Lekas*, 405 F.3d at 612 (finding that up to ninety days in segregation does not affect liberty); *see also Wilkinson v. Austin*, 545 U.S. 209, 224 (2005) (recognizing "duration" is a component that plays a part in determining whether a liberty interest exists).[12]

Here, Thomas alleges he was placed on the GSC side for a little over a month. Although he complains that the conditions there are generally regarded as being more violent, the conditions as described aren't atypical and—coupled with the relatively short length of time he was there—don't state a viable due process claim. *See e.g., Isby*, 856 F.3d at 524 (7th Cir. 2017) (both duration and conditions must be considered); *see also Grieveson*, 538 F.3d at 777 ("[P]risons are dangerous places," as "[i]nmates get there by violent acts, and many prisoners have a propensity to commit more."); *Bissessur v. Indiana Univ. Bd. of Trs.*, 581 F.3d 599, 602 (7th Cir. 2009) (claim must be plausible on its

---

[12] In a recent Seventh Circuit case, the court noted that the answer to whether disciplinary placements in solitary confinement amount to "deprivations of a liberty interest protected by procedural due process" also "depends on the combination of the length of solitary confinement *and* the actual conditions of that confinement as compared to those the prisoners would otherwise experience." *Jackson v. Anastasio*, 150 F.4th 851, 853 (7th Cir. 2025) (emphasis added). In that case, the court concluded the three-month disciplinary placement coupled with the "unusually harsh" and "disgusting" conditions could be enough to trigger due process concerns. *Id.* at 855, 861.

face and complaint must provide adequate factual content). Accordingly, to the extent Thomas is attempting to bring any Fourteenth Amendment due process claims, they will be dismissed.

*First Amendment Retaliation*

Thomas alleges several of the defendants have retaliated against him since his re-arrival at WCF. Under the First Amendment, an inmate can't be punished for engaging in certain kinds of speech. "To establish a prima facie case of unlawful retaliation, a plaintiff must show (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory action." *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020) (internal quotation marks and citation omitted). While these basic elements remain the same whether the plaintiff is a prisoner or a non-prisoner, the details of each element may depend on the context. *Id*. In the prison context, written requests for interviews and/or grievances clearly constitute First Amendment protected activity. *Id.*; *see also Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012) ("A prisoner has a First Amendment right to make grievances about conditions of confinement."). "Inmates retain a First Amendment right to complain about prison staff, whether orally or in writing, but only in ways consistent with their status as prisoners." *Caffey v. Maue*, 679 Fed. Appx. 487, 490 (7th Cir. 2017) (citing *Turner v. Safley*, 482 U.S. 78, 89–90 (1987); *Watkins v. Kasper*, 599 F.3d 791, 796–97 (7th Cir. 2010)). Not all actions alleged to be

retaliatory are "actionable in and of themselves . . .." *Bridges v. Gilbert*, 557 F.3d 541, 552

(7th Cir. 2009). Rather, only "if the acts were taken in retaliation for the exercise of a

constitutionally protected right, then they are actionable under § 1983." *Id*.

Thomas seems to imply that all of the defendants retaliated against him by

ignoring his concerns and/or by failing to protect him from harm. Such generalized

claims are redundant of the substantive failure to protect claims described and

dismissed above. The court has carefully reviewed the actions and comments set forth

in the amended complaint and finds that, as to most of the defendants, Thomas hasn't

plausibly alleged they were personally involved in any sort of intentional First

Amendment deprivation. *See Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) (liability

under 42 U.S.C. § 1983 is based on personal responsibility and prison officials cannot be

held liable for damages solely because they hold supervisory positions); *Horshaw*, 910

F.3d at 1029 ("supervisors are responsible for their own acts but not for those of

subordinates, or for failing to ensure that subordinates carry out their tasks correctly.");

*Burks*, 555 F.3d at 596 ("[P]ublic employees are responsible for their own misdeeds but

not for anyone else's."). Moreover, it's not plausible that every employee he

encountered—including supervisors and high-ranking IDOC officials—was motivated

to retaliate against Thomas because of incidents that occurred five years ago involving

three specific officers. In other words, although Thomas claims the defendants were

made aware of his concerns and his speculation that he was in danger of being harmed

due to the prior incidents, he hasn't sufficiently tied an alleged deprivation by them to

any sort of retaliatory motivating factor. *See Bissessur*, 581 F.3d at 602 (claim must be

plausible on its face). Therefore, the retaliation claims against Warden Smiley, Deputy Warden Gann, Officer Cron, Capt. Lee, Lt. Heinrich, Sgt. Laurie, Grievance Specialist Mrs. S. Smith, Grievance Specialist Mrs. Wozniak, Classification Specialist Mrs. Williams, UTM Corley, I&I Staff, the Indiana Department of Correction, Department of Administration DOC Ombudsman Bureau Director Charlene A. Burkett, and Reception Diagnostic Center Classification Specialist/Counselor Ms. S. May will be dismissed.

That said, several of his other allegations do plausibly suggest retaliation. On the day of his arrival, Sgt. Caldwell laughed and said, "Oh you made it back to Westville, with yo police a**. Be safe on GSC side." ECF 8 at 4. A few days later, Sgt. Flakes mentioned the previous lawsuit against her and "threaten[ed] to have him sent to GSC side. *Id*. About two weeks later, he was sent to the GSC side "as promised by Sgt. Flakes and [Sgt.] Caldwell, despite not having any bad conduct or work history." *Id*. at 5. He stayed on the GSC side for about a month. After he had been returned to the E/C side, the twin sister of Sgt. Flakes said, "Did you like G.S.C. side, we know you back over here, we heard about it, it won't change nothing. We still got you." *Id*. at 6. On June 30, 2025, Sgt. Flakes told him that "if he filed another grievance on her or her sister, [he] would be sent to WCU (lock up)." *Id*. at 7. In response, Thomas wrote to I&I about what had happened. He met with prison officials who "removed Sgt. Flakes from being around Plaintiff." *Id*. A week later, he was moved to the E/C side where he currently remains. He states he "can't file any more grievances on them, out of fear of going to lock up, where he won't be able to talk to family, his children, or see his fiancé." *Id*.

Sgt. Flakes and Sgt. Caldwell were both directly involved in the previous incidents wherein Thomas engaged in a protected activity—namely, the lawsuit and the written incident report about the clipboard. According to Thomas, they sent him to the GSC side *because of* that protected activity. The twin sister of Sgt. Flakes—who plausibly has a vested interest in her relative's well-being—also made statements about having had a hand in moving him to the GSC side because of those incidents and further threatened to send him to lock-up if he filed any more grievances in the future. While the conditions described by Thomas on the GSC side don't rise to the level of being atypical for due process purposes, the fact that the GSC side was allegedly regarded by the inmates as being "known for" additional violence, could potentially deter a person of ordinary firmness from participating First Amendment protected activity in the future. *But see Douglas*, 964 F.3d at 647 (if no "material difference" is identified between the cell locations, the transfer is not likely to deter protected activity). Although the five-year gap makes it less likely that their actions were a motivating factor in the decision to send him to the GSC side, it is at least plausible at this early stage. Thus, giving Thomas the benefit of the inferences to which he is entitled, he has stated plausible First Amendment retaliation claims against Sgt. E. Flakes, Sgt. Flakes (the twin sister of Sgt. E. Flakes), and Sgt. Caldwell.

With regard to Sgt. Franklin, Thomas alleges he spoke with him on April 27, 2025, to advise him of the prior lawsuits and incidents. Sgt. Franklin responded by saying, "I know who you are Thomas, with yo snitching ass, get yo ass back in line, welcome to Westville!" ECF 8 at 9. This brief interaction allegedly prompted Sgt.

17

Franklin to put a $500 hit on Thomas due to that prior protected activity in 2020. While the hit did not come to fruition—according to the note (ECF 8-1 at 24), it was scheduled for the weekend of June 13–15, 2025, but the inmates declined to accept it after speaking with Thomas—the alleged threat of harm could potentially deter a person of ordinary firmness from engaging in future First Amendment activity. *See, e.g., Douglas*, 964 F.3d at 649 ("[N]ot only actual harms but also threats of harm can deter First Amendment activity."). Again, although the allegations are sparse as to why a lawsuit/complaint from five years ago involving different prison guards would motivate Sgt. Franklin to place a hit on Thomas, the court will give him the benefit of the inferences to which he is entitled at this early stage and allow him to proceed on a First Amendment claim against Sgt. Franklin. In addition, because "[t]hreats of grave violence can constitute cruel and unusual punishment under the Eighth Amendment," the court will allow Thomas to proceed on an Eighth Amendment claim against Sgt. Franklin as well. *Hughes v. Farris*, 809 F.3d 330, 334 (7th Cir. 2015) (citing *Dobbey v. Ill. Dep't of Corr.*, 574 F.3d 443, 445 (7th Cir. 2009)).[13]

Two other alleged situations require consideration. On June 25, 2025, Thomas was removed from the medicine line to speak with Capt. Esbedos who said, "I don't care about any lawsuit you have, you don't mess with my officers. I have my own rules

---

[13] Immediately following the incident with the note, Thomas had a meeting with Lt. Heinrich, Capt. Lee, and UTM Thompson where he explained what had been happening. Thomas claims they didn't show "any kind of concern or sympathy," refused his request for a transfer to a new prison, and instead became "irritated and angry." ECF 8 at 10. These allegations aren't sufficient to state a claim, especially in light of the fact that Thomas admits he was moved to a small "detox cell" for the rest of the day and then moved back to the E/C side. *Id.* at 11.

over here." ECF 8 at 6. When Thomas asked him what that meant, he replied, "You're gonna find out." *Id*. at 7. It's true that a threat of harm can be determined to deter protected activity. *See, e.g., Douglas*, 964 F.3d at 649. However, taking his words at face value, the supposed threat was *not* related to the prior lawsuits; rather Capt. Esbedos was generally warning against "mess[ing]" with his officers. First Amendment activity by a prisoner is only protected when done in "ways consistent with their status as prisoners." *Caffey*, 679 Fed. Appx. at 490. Therefore, even if Capt. Esbedos had been named as a defendant in the caption of the amended complaint—which he has not—the allegation that he issued a vague warning against "mess[ing] with" his officers is insufficient to state a plausible First Amendment claim against him.

In a similar vein, Thomas alleges Case Manager/Counselor Kecia Green and UTM Corley threatened him with a write-up. Specifically, Thomas states he was moved back to the E/C side on July 14, 2025, so that he could begin working in the "Production Kitchen." ECF 8 at 19. By this point, he had been moved to multiple different areas of the prison in response to his safety concerns. However, a few days after that transfer, he "found out that Sgt. Franklin works in Production Kitchen through Aramark on days he does not work Sgt. for IDOC." *Id*. He immediately wrote to Case Manager/Counselor Kecia Green and UTM Corley "explaining he believes his life and safety will be at risk if he is put in the kitchen and Sgt. Franklin is the Sgt. over there." *Id*. According to Thomas, UTM Corley told him if he refused to go to his job, he would be "written up for refusal." *Id*. at 20. Thomas explains that he doesn't want to "lose any good time or receive [a] write up," so he intends to continue going to the kitchen as instructed. *Id*.

19

UTM Corley's statement can't reasonably be construed as an actionable threat/deprivation for First Amendment purposes. Nothing plausibly suggests Thomas's protected activity played any part—much less was a motivating factor—in the decision to advise Thomas of the consequences he could face for refusing to go to his job. Rather, UTM Corley issued a predictive statement about the penalties associated with refusal. To the extent Thomas expressed his safety concerns to justify his reluctance, he admits both UTM Corley and Case Manager/Counselor Kecia Green explained to him that their roles at the prison involved getting inmates "ready to go home and housing placements, not investigations." ECF 8 at 20. They advised him to contact I&I instead if he felt there was a safety issue. *See Aguilar*, 861 F.3d at 633; *Burks*, 555 F.3d at 594 (division of labor is critical in prison setting). Thus, the First Amendment retaliation claims against Case Manager/Counselor Kecia Green and UTM Corley will be dismissed as well.

*Preliminary Injunction*

Finally, Thomas has moved for a preliminary injunction. ECF 9. "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). To obtain a preliminary injunction, the moving party "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

20

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). In general, the purpose of a preliminary injunction is to preserve the status quo pending final resolution of the case on the merits. *See Lackey v. Stinnie*, 604 U.S. --, 145 S. Ct. 659, 667 (2025) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held and to balance the equities as the litigation moves forward." (cleaned up)). A preliminary injunction, thus, "merges" into a permanent injunction entered as part of the judgment on the merits. *See Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 314 (1999).

Thomas asks the court to order the defendants to cease the "retaliation and harassment and threats" against him. ECF 9 at 2. He further asks to be "immediately transfer[red]" to another facility where he "can feel safe." *Id*. However, he has not plausibly alleged an ongoing failure to protect claim in his amended complaint that would warrant preliminary injunctive relief. Moreover, although he has stated plausible claims of retaliation against several of the defendants, he hasn't sufficiently alleged he will be irreparably harmed pending the outcome of this case. He admits he was transferred from the GSC side to various different locations after approximately one month, and he doesn't plausibly allege he is in current danger of being transferred back there. Accordingly, the motion for a preliminary injunction will be denied.

For these reasons, the court:

(1) DENIES the first motion for preliminary injunction as moot (ECF 4);

(2) DENIES the second motion for preliminary injunction on the merits (ECF 9);

(3) GRANTS Charles Thomas leave to proceed against Sgt. E. Flakes, Sgt. Flakes

(Sgt. E. Flakes' twin sister), and Sgt. Caldwell, in their individual capacities for

monetary damages for having him transferred to a materially worse area of the prison

in the spring of 2025 in retaliation for filing a lawsuit against Sgt. E. Flakes and an

internal complaint against Sgt. Caldwell in 2020 in violation of the First Amendment;

(4) GRANTS Charles Thomas leave to proceed against Sgt. Flakes

(Sgt. E. Flakes' twin sister) in her individual capacity for monetary damages for

threatening to send him to the Westville Control Unit lock-up on June 30, 2025, in

retaliation for filing grievances against her and her twin sister in the spring/summer of

2025 in violation of the First Amendment;

(5) GRANTS Charles Thomas leave to proceed against Sgt. Franklin in his

individual capacity for monetary damages for attempting to recruit other inmates to kill

Thomas on or about June 13–15, 2025, in exchange for $500 in retaliation for filing a

lawsuit against Sgt. E. Flakes and an internal complaint against Sgt. Caldwell in 2020 in

violation of the First Amendment;

(6) GRANTS Charles Thomas leave to proceed against Sgt. Franklin in his

individual capacity for monetary damages for subjecting Thomas to cruel and unusual

punishment when he threatened to have Thomas killed by other inmates on or about

June 13–15, 2025, in exchange for $500 in violation of the Eighth Amendment;

(7) DISMISSES all other claims;

(8) DISMISSES Warden Smiley, Deputy Warden Gann, Ofc. Cron, Capt. Lee, Lt.

Heinrich, Sgt. Laurie, E/C Complex Caseworker/Manager Kecia Green, UTM Ryan

Thompson, Grievance Specialist Mrs. S. Smith, Grievance Specialist Mrs. Wozniak,

Classification Specialist Mrs. Williams, UTM Corley, I&I Staff, the Indiana Department of Correction, the Department of Administration DOC Ombudsman Bureau Director Charlene A. Burkett, and Reception Diagnostic Center Classification Specialist/Counselor Ms. S. May;

(9) DIRECTS the clerk, under 28 U.S.C. § 1915(d), to request Waiver of Service from (and if necessary, the United States Marshals Service to use any lawful means to locate and serve process on) Sgt. E. Flakes, Sgt. Flakes (Sgt. E. Flakes' twin sister), Sgt. Caldwell, and Sgt. Franklin at the Indiana Department of Correction, with a copy of this order and the amended complaint (ECF 8);

(10) ORDERS the Indiana Department of Correction to provide the full name, date of birth, and last known home address of any defendant who does not waive service if it has such information; and

(11) ORDERS, under 42 U.S.C. § 1997e(g)(2), Sgt. E. Flakes, Sgt. Flakes (Sgt. E. Flakes' twin sister), Sgt. Caldwell, and Sgt. Franklin to respond, as provided for in the Federal Rules of Civil Procedure and N.D. Ind. L.R. 10-1(b), only to the claims for which the plaintiff has been granted leave to proceed in this screening order.

SO ORDERED on November 5, 2025.

s/ Holly A. Brady
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT